_____ FILED          _____ ENTERED
_____ LODGED        _____ RECEIVED

# UNITED STATES DISTRICT COURT

SEP 1 6 2014

for the
Western District of Washington

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

In the Matter of the Search of                 )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*       )     Case No. MJ14-363
Electronic File: "Jeff Hanson Back Up" currently stored  )
on SUBJECT HARD DRIVE, more fully described in  )
Attachment A, attached hereto.                  )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Electronic File: "Jeff Hanson Back Up" currently stored on SUBJECT HARD DRIVE, more fully described in Attachment A, attached hereto and incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Please see Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1204(a) | International Parental Kidnapping |

The application is based on these facts:
Please see attached Affidavit of Detective Bryan Van Brunt, FBI TFO

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Detective Bryan Van Brunt, FBI TFO**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/16/14

_____
*Judge's signature*

City and state: Seattle, Washington

John L. Weinberg, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF BRYAN VAN BRUNT

STATE OF WASHINGTON    )
                           )   ss
COUNTY OF KING          )

I, Bryan Van Brunt, being first duly sworn on oath, depose and say:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer (TFO) of the Federal Bureau of Investigation (FBI) and have been so since 2008. I am a Detective with the City of Seattle and have been so since 2005. Prior to 2005, I was a Patrol Officer with the City of Seattle and had been so since 2001. As a TFO and Detective, I have investigated and/or participated in investigations, including those pertaining to narcotics, firearms, and conspiracy offenses. I have acquired knowledge and information about these offenses and the various means and methods by which they are executed, through formal and informal training, other law enforcement officers and investigators, informants, individuals I have arrested and interviewed, as well as through my participation in other investigations.

2. I am currently assigned to the Seattle Safe Streets Task Force (SSSTF) of the Seattle Division of the FBI, which focuses on both gang-related and violent crimes. I am currently authorized to investigate and enforce violations of federal criminal statutes, including those found in Title 18 and 21 of the United States Code.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I have not included every fact concerning this investigation. This affidavit is intended to show merely that there is a sufficient factual basis for a fair determination of probable cause to support the Application.

## II. APPLICABLE LAW

4. Title 18, United States Code, Section 1204 provides that it is a crime for an individual, including a parent, to remove a child from the United States, or to attempt to

AFFIDAVIT OF BRYAN VAN BRUNT - 1

do so, with the intent to obstruct the lawful exercise of parental rights. The term "parental rights" means the right to physical custody of the child whether joint or sole, and whether arising by operation of law, court order, or legally binding agreement of the parties.

### III. STATEMENT OF PROBABLE CAUSE

5. On September 12, 2014, a federal Complaint was signed by Chief United States Magistrate Judge Mary Alice Theiler in the U.S. District Court for the Western District of Washington alleging that Jeffrey Ford Hanson had committed the crime of International Parental Kidnapping in violation of Title 18, United States Code, Section 1204(a). A copy of the Complaint is attached as Exhibit 1 and incorporated by reference herein.

6. On September 12, 2014, FBI Special Agents in Seattle interviewed Leonard Riojas. Riojas identified himself as JEFFREY FORD HANSON's friend, who has known JEFFREY FORD HANSON for approximately two years. During the interview, Riojas told Agents that JEFFREY FORD HANSON had asked him to backup up his (JEFFREY FORD HANSON's) hard drive. JEFFREY FORD HANSON then gave Riojas a hard drive, which Riojas imaged on Riojas's personal computer sometime in September 2014. After doing so, Riojas returned JEFFREY FORD HANSON's hard drive to JEFFREY FORD HANSON.

7. At that time, Agents asked Riojas if he would allow the FBI to image his hard drive (hereinafter the "SUBJECT HARD DRIVE") to get only material pertaining to JEFFREY FORD HANSON. Riojas advised that he would be amenable to assist the FBI, and asked Agents to provide him with a thumb drive and he would make a copy for the FBI. Agents advised Riojas, in order to preserve the integrity of the evidence and the chain of custody process, it would be preferred that FBI technicians perform the imaging. Riojas stated that he would prefer to do imaging himself. Agents thanked Riojas for his time advised they would get back in contact with him with a solution to

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  image the SUBJECT HARD DRIVE without causing too much of an inconvenience for
2  him. At this time, the interview was discontinued.
3      8.      Approximately 40 minutes later, members of the Safe Streets Task Force
4  returned and advised Riojas that his consent for the FBI to take possession of the
5  SUBJECT HARD DRIVE would assist with an investigation with an exigent
6  circumstance. Riojas then voluntarily provided the SUBJECT HARD DRIVE to Agents.
7  Agents then provided Riojas with a FD-597, Receipt of Property form. Riojas advised
8  that in the SUBJECT HARD DRIVE, JEFFREY FORD HANSON's material would be
9  titled, "Jeff Hanson Back Up." Agents then delivered the SUBJECT HARD DRIVE to
10 FBI technicians, who made a forensic imaged of the "Jeff Hanson Back Up" materials
11 located on the SUBJECT HARD DRIVE. The FBI began immediately searching the
12 "Jeff Hanson Back Up" portion of the SUBJECT HARD DRIVE with the consent of the
13 Unites States Attorney's Office based upon exigent circumstances.
14     9.      Individuals I have spoken with, including practiced mariners, have
15 informed me that individuals planning international marine travel frequently use their
16 computers to plan such travel, including booking marina reservations, plotting travel on
17 maps, and searching destination locations, among other things. In addition, individuals
18 planning international travel purchase supplies to facilitate such travel. Digital receipts
19 for, and lists of, these supplies are often kept on computers. Furthermore, as set forth in
20 the attached Complaint, JEFFREY FORD HANSON recently contacted a number of
21 individuals concerning his plans to leave the United States and travel internationally. In
22 my training and experience, individuals planning travel, contact others via electronic
23 communications, which are sent via their computers.
24     10.     In addition, the "Jeff Hanson Back Up" Section of the SUBJECT HARD
25 DRIVE is all potential storage media for evidence of the criminal activity. From my
26 training and experience and the training and experience of other law enforcement officers
27 to whom I have spoken, I believe that a computer and other digital device or storage
28 media used in relation to a crime of this type may contain: data that is evidence of how

AFFIDAVIT OF BRYAN VAN BRUNT - 3

and when the computer and other digital devices was used to conduct financial transactions; data that was sent to or received from financial institutions; notes as to how the criminal conduct was achieved; communications between co-conspirators; and other records that indicate the nature of the offense.

11.     As described in Attachment A, this application seeks permission to search for records and evidence that might be found on the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE. One form in which the records might be found is as digital data, stored on the hard drive. Thus, the warrant applied for would authorize the seizure and search of the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

12.     *Probable cause.* I submit that if for the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE described in Attachment A there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience and the training and experience of other law enforcement personnel to whom I have spoken, I know that computer files or remnants of such files can be preserved (and consequently also then recovered) for months or even years after they have been downloaded onto a storage medium, deleted, or accessed or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In

AFFIDAVIT OF BRYAN VAN BRUNT - 4

1 | addition, a computer's operating system may also keep a record of deleted data in a
2 | "swap" or "recovery" file.

3 |    c.  Wholly apart from user-generated files, computer storage media—in
4 | particular, computers' internal hard drives—contain electronic evidence of how a
5 | computer has been used, what it has been used for, and who has used it. To give a few
6 | examples, this forensic evidence can take the form of operating system configurations,
7 | artifacts from operating system or application operation, file system data structures, and
8 | virtual memory "swap" or paging files. Computer users typically do not erase or delete
9 | this evidence, because special software is typically required for that task. However, it is
10 | technically possible to delete this information.

11 |   13. *Forensic evidence.* This application seeks permission to locate not only
12 | computer files that might serve as direct evidence of the crimes described on the warrant,
13 | but also for forensic electronic evidence that establishes how computers and other digital
14 | devices were used, the purpose of their use, who used them, and when. There is probable
15 | cause to believe that this forensic electronic evidence will be on any computers and
16 | digital devices described in Attachment A because:

17 |    a.  Stored data can provide evidence of a file that was once on the
18 | device but has since been deleted or edited, or of a deleted portion of a file (such as a
19 | paragraph that has been deleted from a word processing file). Virtual memory paging
20 | systems can leave traces of information on the storage medium that show what tasks and
21 | processes were recently active. Web browsers, e-mail programs, and chat programs store
22 | configuration information that can reveal information such as online nicknames and
23 | passwords. Operating systems can record additional information, such as the attachment
24 | of peripherals, the attachment of USB flash storage devices or other external storage
25 | media, and the times the computer was in use. Computer file systems can record
26 | information about the dates files were created and the sequence in which they were
27 | created.
28 |

AFFIDAVIT OF BRYAN VAN BRUNT - 5

b.      Forensic evidence on a computer and other digital device or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a computer and other digital device or storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

14.      *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search for information that might be stored on a computer or other digital device or storage media often requires the seizure of the physical items and later

AFFIDAVIT OF BRYAN VAN BRUNT - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

off-site review consistent with the warrant. In lieu of removing all of these items from the premises, it is sometimes possible to make an image copy of the computer or storage media, onsite. Generally speaking, imaging is the taking of a complete electronic picture of the device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the item, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

      a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine the respective device/media to obtain evidence. Computer hard drives, digital devices and electronic storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the items off-site and reviewing them in a controlled environment will allow examination with the proper tools and knowledge.

      c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

AFFIDAVIT OF BRYAN VAN BRUNT - 7

15. *Processing the Data*

a. Upon approval of the warrant, the search team will continue its review of the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE described in Attachment A that are capable of containing data or items that fall within the scope of Attachment B to this Affidavit.

16. *Searching the Forensic Images*

a. Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit. Those techniques, however, may necessarily expose many or all parts of a hard drive to human inspection in order to determine whether it contains evidence described by the warrant.

b. These methodologies, techniques and protocols may include the use of a "hash value" library to exclude normal operating system files that do not need to be further searched. Agents may utilize hash values to exclude certain known files, such as the operating system and other routine software, from the search results. However, because the evidence I am seeking does not have particular known hash values, agents will not be able to use any type of hash value library to locate the items identified in Attachment C.

17. If, after conducting its examination, law enforcement personnel determine that the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE is an instrumentality of the criminal offenses referenced above, the government may retain that

AFFIDAVIT OF BRYAN VAN BRUNT - 8

device during the pendency of the case as necessary to, among other things, preserve the instrumentality evidence for trial, ensure the chain of custody, and litigate the issue of forfeiture.

18.    *Past Efforts To Obtain Electronically Stored Information.*  As noted above, the FBI began searching the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE on September 12, 2014, pursuant to exigent circumstances.

## CONCLUSION

19.    For the foregoing reasons, I respectfully submit that there is probable cause to believe that evidence of International Parental Kidnapping, more fully described in Attachment B, will be found on the "Jeff Hanson Back Up" Section of the SUBJECT HARD DRIVE more fully described in Attachment A.

BRYAN VAN BRUNT
TASK FORCE OFFICER
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me on the ____16____ day of September, 2014.

JOHN L. WEINBERG
United States Magistrate Judge

AFFIDAVIT OF BRYAN VAN BRUNT - 9

FILED ——— ENTERED
——— LODGED ——— RECEIVED

SEP 1 2 2014

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

The Honorable Mary Alice Theiler

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

JEFFREY FORD HANSON,

        Defendant.

NO. 14- MJ - 357

**COMPLAINT**

Title 18, United States Code,
Section 1204

BEFORE, MARY ALICE THEILER, Chief United States Magistrate Judge, U.S.

Courthouse, Seattle, Washington.

## COUNT 1
### (International Parental Kidnapping)

On or about September 4, 2014, and continuing to the present, within the Western

District of Washington, at Seattle, and elsewhere, JEFFREY FORD HANSON, did

knowingly remove, or attempt to remove, B.H., a child under the age of 16, from the

United States and did knowing retain B.H., who had been in the United States, outside

the United States with the intent to obstruct the lawful exercise of parental rights by the

mother of B.H., J.H..

All in violation of Title 18, United States Code, Section 1204(a).

U.S. V. JEFFREY FORD HANSON
COMPLAINT - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The undersign complainant, Bryan Van Brunt, being duly sworn states that this Complaint is based on the following information:

## I.    INTRODUCTION AND AGENT BACKGROUND

4.    I am a Task Force Officer (TFO) of the Federal Bureau of Investigation (FBI) and have been so since 2008. I am a Detective with the City of Seattle and have been so since 2005. Prior to 2005, I was a Patrol Officer with the City of Seattle and had been so since 2001. As a TFO and Detective, I have investigated and/or participated in investigations, including those pertaining to narcotics, firearms, and conspiracy offenses. I have acquired knowledge and information about these offenses and the various means and methods by which they are executed, through formal and informal training, other law enforcement officers and investigators, informants, individuals I have arrested and interviewed, as well as through my participation in other investigations.

5.    I am currently assigned to the Seattle Safe Streets Task Force (SSSTF) of the Seattle Division of the FBI, which focuses on both gang-related and violent crimes. I am currently authorized to investigate and enforce violations of federal criminal statutes, including those found in Title 18 and 21 of the United States Code.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I have not included every fact concerning this investigation. This affidavit is intended to show merely that there is a sufficient factual basis for a fair determination of probable cause for this Complaint. I have set forth only the facts I believe are necessary to establish probable cause to believe that JEFFREY FORD HANSON committed a violation of Title 18, United States Code, Section 1204(a).

## II.    APPLICABLE LAW

7.    Title 18, United States Code, Section 1204 provides that it is a crime for an individual, including a parent, to remove a child from the United States, or to attempt to do so, with the intent to obstruct the lawful exercise of parental rights. The term

U.S. V. JEFFREY FORD HANSON
COMPLAINT - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"parental rights" means the right to physical custody of the child whether joint or sole, and whether arising by operation of law, court order, or legally binding agreement of the parties.

### III.    STATEMENT OF PROBABLE CAUSE

8.      B.H. is the son of J.H. and JEFFREY FORD HANSON, who are currently divorced. B.H. and J.H. live in Hazelton, Pennsylvania. B.H. was born on August 24, 2005 and is 9 years old.

9.      Pursuant to a King County (Washington) Superior Court Order, J.H. is the main custodial parent of B.H. In the section of the Order entitled "Schedule for Children Under School Age", the Order provides that B.H. shall reside with J.H., but gives JEFFREY FORD HANSON monthly visitation rights for up to six consecutive days. In another paragraph in that section, the Order reads:

> "Other visits with mother and child can be arranged by agreement of the parties. After the child reaches the age of nine, the father may travel domestically or internationally for up to one year exclusively with the child."

10.     On July 17, 2014, B.H., with J.H.'s permission, flew to Seattle to visit with JEFFREY FORD HANSON. B.H. was expected to fly back to Pennsylvania on September 4, 2014, but he was not on the return flight. After he failed to return to Pennsylvania, J.H. reported B.H. missing to the Hazelton Police Department. The Hazelton Police Department contacted the Port of Seattle Police Department which requested assistance from the FBI on September 10, 2014.

11.     During the time B.H. was visiting JEFFREY FORD HANSON in Washington State, J.H. received several text messages and phone calls from JEFFREY FORD HANSON that led her to believe that JEFFREY FORD HANSON intended to not return B.H. to her custody. The last time J.H. spoke with JEFFREY FORD HANSON and B.H. was on August 30, 2014.

U.S. V. JEFFREY FORD HANSON
COMPLAINT - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   12.   On September 10, 2014, FBI SSA Carolyn Woodbury spoke with J.H., who

2   stated that JEFFREY FORD HANSON is dangerous and has a history of alcohol abuse.

3   J.H. also said that JEFFREY FORD HANSON's friends told J.H. that JEFFREY FORD

4   HANSON is currently using methamphetamine. J.H. stated that JEFFREY FORD

5   HANSON has a history of getting into physical altercations and that she fears JEFFREY

6   FORD HANSON will harm B.H. should law enforcement get involved in B.H.'s

7   recovery.

8       13.   On September 11, 2014, an FBI Safe Streets Task Force member spoke

9   with Carey Jambresic. Jambresic stated that she has known JEFFREY FORD HANSON

10  and his family, which includes JEFFREY FORD HANSON's father (Billy Sr.), and other

11  son (Chad) for over 30 years. Jambresic stated that JEFFREY FORD HANSON is

12  mentally unstable and is actively smoking crystal methamphetamine, taking oxycontin,

13  and drinking alcohol. Jambresic further stated that JEFFREY FORD HANSON, who

14  lives on a boat, has no funds and would have difficulty paying for moorage, and other

15  expendables if he did depart the Seattle, Washington area on his boat.

16      14.   Jambresic said that she first heard that JEFFREY FORD HANSON did not

17  intend to return B.H. to his ex-wife in late July during a conversation with JEFFREY

18  FORD HANSON's father (Billy Sr.). During this timeframe, Jambresic assumed that

19  JEFFREY FORD HANSON was traveling with B.H. by boat to Blake Island, an island in

20  the San Juan Islands, Washington. Jambersic also reported that B.H. is unable to swim.

21  During the conversation with Billy Sr., Billy Sr. told Jambresic that JEFFREY FORD

22  HANSON made statements to the effect that he had no intent of returning B.H. to his

23  mother. Billy Sr. further confirmed that JEFFREY FORD HANSON and Billy Sr. knew

24  that JEFFREY FORD HANSON was breaking the law by not returning B.H. Because of

25  this realization, Jambresic believed that Billy Sr. would not divulge JEFFREY FORD

26  HANSON's or B.H.'s current whereabouts to law enforcement.

27      15.   Jambresic stated that JEFFREY FORD HANSON's son (B.H.) had been

28  visiting his father every summer for approximately the last 5 years (in Washington State).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Jambresic stated that during these visits, JEFFREY FORD HANSON would both physically and emotionally abuse B.H. This abuse included hitting B.H., apparently as a means of attempting to "toughen" B.H. Jambresic stated that Billy Sr. was aware of this treatment of his grandson but attributed it to a parenting technique with which he (Billy Sr.) would not interfere.

16.     Jambresic also reported that the last contact she and her family had with JEFFREY FORD HANSON was during a violent verbal altercation with him in downtown Ballard, Washington in July 2014. During this altercation, JEFFREY FORD HANSON threatened to kill Jambresic's family.

17.     On September 11, 2014, an FBI Safe Streets Task Force member contacted Damen Armocido, who identified himself as a former friend of JEFFREY FORD HANSON, whom he has known since high school. Armocido reported that JEFFREY FORD HANSON, over the last five years, has threatened to take B.H. and that JEFFREY FORD HANSON's mental capacity has been deteriorating. Armocido said that within the last three months, JEFFREY FORD HANSON told him that his ex-wife "deserves this." Armocido replied, "She deserves not knowing where her son is and that he is missing?" JEFFREY FORD HANSON did not reply.

18.     Additionally, during the second week of August 2014, Armocido and JEFFREY FORD HANSON went shopping at Costco. During this trip, JEFFREY FORD HANSON purchased extra supplies such as batteries and said that he was taking B.H.

19.     On September 11, 2014, FBI Safe Streets Task Force members contacted Dawnya Robinson, who identified herself as a former friend of JEFFREY FORD HANSON, whom she has known since high school. Robinson said that approximately one month ago, JEFFREY FORD HANSON sent her a text message, and in the message said that he was leaving the country, going to Mexico, and taking his son.

20.     Armocido and Robinson stated that JEFFREY FORD HANSON is an experienced sailor and lives on his boat. The boat registered to JEFFREY FORD

U.S. V. JEFFREY FORD HANSON
COMPLAINT - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

HANSON is a 1976 35 foot sailboat, which bears the name "Draco." It has the following registration numbers WN6753NZ and WNZG03620176.

21.    On August 28, 2014, the Hazelton Police Department called the Port of Seattle Police Department, at J.H.'s request, and asked them to conduct a welfare check on B.H. due to J.H. believing that JEFFREY FORD HANSON would not return B.H. to her custody. Port of Seattle Police Officer Freutel responded to the Shilshole Bay Marina at 7001 Seaview Avenue, NW, in Seattle, Washington where JEFFREY FORD HANSON's boat was kept in slip V34.

22.    Upon arriving at the Marina, Officer Freutel contacted JEFFREY FORD HANSON and noted that JEFFREY FORD HANSON was preparing for a "journey." Officer Freutel also spoke with B.H., who said that he (B.H.) wanted to stay with JEFFREY FORD HANSON in order to go sailing to Blake Island, Washington. JEFFREY FORD HANSON told Officer Freutel that he would contact J.H. in order to ask for an extension on his visitation with B.H. so he could take them sailing. Before leaving, Officer Freutel advised JEFFREY FORD HANSON that if he violated the terms of the parenting plan he could be arrested for Custodial Interference 2nd degree. No enforcement action was taken as JEFFREY FORD HANSON was still within his legal rights to visit with B.H. at that time and B.H. seemed to be in good health.

23.    During his initial investigation, Officer Freutel wrote an incident report in which he noted that Armocido told Officer Freutel that JEFFREY FORD HANSON has said, several times, that he is going to keep B.H. and not return him to his mother and just sail away forever.

24.    On September 6, 2014, the Port of Seattle Police Department, again, responded to the Shilshole-Bay Marina but found that JEFFREY FORD HANSON, B.H., and the boat were missing. JEFFREY FORD HANSON's neighbor at the marina, Geoffery Tyson, who uses slip V32, told the responding Port of Seattle Police Officer that he had a conversation on with JEFFREY FORD HANSON on August 28th or 29th,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  2014 in which JEFFREY FORD HANSON said he planned to take B.H. and sail to
2  California or Mexico.

3      25.    I believe at this time that JEFFREY FORD HANSON has fled with B.H.
4  despite the existing court order and has done so by using his registered boat. While it is
5  not clear to where JEFFREY FORD HANSON is fleeing given the conflicting witness
6  accounts, his flight may involve international travel to Mexico.

7      26.    On September 11, 2014, FBI Special Agents in Los Angeles interviewed
8  Vicki Horvath. Horvath identified herself as a friend of JEFFREY FORD HANSON,
9  whom she has known since high school. Horvath told investigators that in May 2014,
10  JEFFREY FORD HANSON showed up unannounced in Venice, California and stayed
11  the night at her residence. While at the residence, JEFFREY FORD HANSON began
12  consuming alcohol and repeatedly told Horvath that he is going to take his child out on
13  his boat and leave forever. On August 23, 2014, JEFFREY FORD HANSON left
14  Horvath a voicemail in which he said, "Going to go." On August 24, 2014, JEFFREY
15  FORD HANSON left Horvath another voicemail in which he said, "I'm sending you the
16  photos." Horvath said JEFFREY FORD HANSON is bitter and angry with J.H. due to
17  her having a child with another man and for leaving him (Hanson). Horvath believes that
18  JEFFREY FORD HANSON will harm B.H. in order to spite J.H.

19      27.    On September 11, 2014, FBI Special Agents in Los Angeles interviewed
20  Heidi Howard. Howard identified herself as a friend of JEFFREY FORD HANSON,
21  whom she has known since high school. On August 23, 2014, Howard said that she
22  received a text message from JEFFREY FORD HANSON in which JEFFREY FORD
23  HANSON wrote that he has made enough money to keep the Draco afloat (Draco is the
24  name of Hanson's boat). In the same text message, JEFFREY FORD HANSON wrote
25  Howard,
26  "ps.grow.your.body.hair.out.you'll.need.it.for.ta.keep.you.warm.around.the.'horn…". I
27  believe that the reference to the 'horn' in the text message is a reference to Cape Horn,
28  located at the southern tip of South America.

U.S. V. JEFFREY FORD HANSON
COMPLAINT - 7

28. Howard told investigators that in August 2104, Hanson started to mail her random photos he had in his possession. These pictures were of Hanson and Howard and were taken when they attended high school. On August 28, 2014, Howard received a mailed package from JEFFREY FORD HANSON. This package contained pictures, bowties, and a book. Howard said that she believed that JEFFREY FORD HANSON was parceling out his property and that this action is indicative of someone who is going to commit suicide. Howard also said that she received a mailing from JEFFREY FORD HANSON four days ago. However, Howard did not open the envelope until today. On the outside of the envelope was written, "Hanson the blond headed Manson." The return information on the envelope was, "the little red boat on the ocean." Inside the envelope, Howard found a letter that, in part, said "My poor little ex espossa J.H. will be the victim y a reminder to the rest you know where the bodies are crab food." Howard also corroborated Horvath's statement that JEFFREY FORD HANSON is bitter and angry.

29. On September 11, 2014, FBI Special Agents in Seattle interviewed Al Hughes. Hughes identified himself as an associate of JEFFREY FORD HANSON and his neighbor. Hughes said that he has known JEFFREY FORD HANSON for 15 to 20 years. Hughes told investigators that he received a text message from JEFFREY FORD HANSON on August 29, 2014. In the text message, Hanson said, "All.good!Cops.are.in.on.it.keys.in.the.dock.box.no.offence.ill.take.the.ging.overu.sandra .locke.ps.everyone.shares.the.jaglen.can.have.the.honda.hey.you.ever…" Hughes believes that this text message indicates that Hanson is giving away the Honda and that he (Hanson) will not be returning for a long time.

30. On September 11, 2014, FBI Special Agents in Seattle interviewed Garey Harr, the Shilshole-Bay Marina Dock Captain. Harr identified himself as JEFFREY FORD HANSON's neighbor and said that he has known him for 3 and a half years. Harr said that JEFFREY FORD HANSON recently told him that he (Hanson) was planning on heading south. Harr also said that he saw JEFFREY FORD HANSON getting ready to

U.S. V. JEFFREY FORD HANSON
COMPLAINT - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  go and that JEFFREY FORD HANSON was preparing for travel by building extra

2  storage on his boat.

3       31.    On September 11, 2014, FBI Special Agents in Seattle interviewed

4  Katherine Goodman, the Shilshole-Bay Marina Manager. Goodman told investigators

5  that JEFFREY FORD HANSON has not paid his moorage fees for the months of August

6  and September 2104.

7       32.    On September 11, 2014, FBI SA Dean Giboney interviewed Andrea Bunch,

8  a security officer for Bank of America. Pursuant to a Grand Jury subpoena, Bunch told

9  SA Giboney that Hanson has a linked savings and checking account with Bank of

10  America. On August 18, 2014, both accounts were drawn down to near $0 balances.

11  These withdrawals were made via debit card at the Crown Hill ATM. Bunch said that

12  $460 was withdrawn from Hanson's saving's account and $60 was withdrawn from

13  Hanson's checking account. Since these withdrawals there has been minimal activity on

14  either of Hanson's accounts.

15       33.    Based on the aforementioned facts, I believe that JEFFREY FORD

16  HANSON has committed the crime of International Parental Kidnapping in violation of

17  Title 18, United States Code, Section 1204(a) by removing, or attempting to remove, a

18  child outside the United States with the intent to obstruct the lawful exercise of parental

19  rights.

20

21

22  BRYAN VAN BRUNT, Complainant

23  TASK FORCE OFFICER
   Federal Bureau of Investigation

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Based on the Complaint and Affidavit sworn to before me, and subscribed in my

2   presence, the Court hereby finds that there is probable cause to believe JEFFREY FORD

3   HANSON committed the offense set forth in the Complaint.

4       Dated: September 12, 2014

5

6       _____

7       MARY ALICE THEILER
        Chief United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>ATTACHMENT A</u>

## ITEMS TO BE SEARCHED

I.   Electronic File: "Jeff Hanson Back Up" currently stored on SUBJECT HARD
     DRIVE, more fully described as: I/O Magic Hard Drive (silver and black),
     measuring approximately 6" x 10."

ATTACHMENT A- 1

## **ATTACHMENT B**
### **ITEMS TO BE SEIZED**

The items to be seized are the following items or materials that may contain evidence of the commission of, the fruits of, or property which has been used as the means of committing federal criminal violations of Title 18, United States Code, Section 1204(a):

1.    Any documents or any other materials reflecting any travel plans;

2.    Any documents or other materials such as ledgers, receipts, notes, and similar items relating to the acquisition or transportation of any goods for use in travel;

3.    Any documents or other materials concerning travel by sea, including by sailing, sailboats, and marinas.

4.    Any contact lists, address books, or directories.

5.    Any documents or other materials reflecting financial activity, including bank account and credit statements, withdrawals or deposits of money.

6.    All data included in the memory of the hard drive, including but not limited to telephone directories, address books, emails, text messages, voice mail, electronic correspondence, and other electronic data or records which may tend to show the identity, location, purpose, plan or knowledge of any individual involved in the commission of the offense.

ATTACHMENT B- 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970